ARBOGAST v. AMERICAN EXCH. NAT. BANK OF CHICAGO et al.

(Circuit Court of Appeals, Seventh Circuit. October 6, 1903.)

No. 957.

1. BANKS—ACTS OF PRESIDENT—AUTHORITY—REPUDIATION.

Where the directors of a bank had not authorized its president to make an agreement to extend time to a debtor or to refrain from selling pledged stock for the liquidation of the debt, and the circumstances raised no implication of authority, and such agreement by the person who was never president was never ratified, the bank was not bound thereby.

2. SAME—SALE OF COLLATERALS—GOOD FAITH.

After more than eight months had elapsed since a debtor's assignment without any payment having been made on the debt for which collaterals had been deposited, the creditor deposited the collaterals with its attorney, with directions to realize thereon, and he notified the assignee that unless the claim was paid promptly he would sell the collateral. After an extension had been refused and the assignee was unable to pay, the attorney notified him of a bid of $30,000 for the collateral, and after the assignee acknowledged his inability to find a better one the attorney sold the collateral for that price. *Held*, that the sale was valid.

3. SAME—ADEQUATE REMEDY AT LAW.

Where certain stock was delivered to a bank as credit for a loan, and, the loan not having been paid, the stock was sold for an alleged inadequate price, and plaintiff charged that the directors and officers of the bank had participated in a campaign inaugurated by its president to bear the stock, but failed to prove that any one connected with the bank, except the person who was president, knew of or took part in such campaign, the debtor had an adequate remedy at law for damages against the persons who depreciated the stock in the market, and he was therefore not entitled to relief in equity by redemption from the bank's sale.

Appeal from the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

In 1893 Schumacher owed the American Exchange National Bank $30,000, and deposited as collateral security 1,000 shares of American Cereal Company stock owned by him, with authority to the bank to sell it at public or private sale, without demand or notice, if the debt was not paid at maturity. On December 17, 1896, the debt being long past due and unpaid, the bank sold the collateral at private sale to Walter D. Douglas for $30,000. In this suit, begun about a year later, Schumacher's assignee sought to redeem the stock on the grounds (1) that the sale was made in violation of a contract between Schumacher and the bank, and (2) that the sale resulted from a conspiracy among the defendants to depreciate the stock and obtain it at less than its true value. From a decree dismissing the bill for want of equity, this appeal was taken.

George W. Ross and Charles P. Abbey, for appellant.
Charles B. Keeler and Charles A. Clark, for appellees.

Before JENKINS and BAKER, Circuit Judges, and BUNN, District Judge.

BAKER, Circuit Judge: 1. The evidence of the alleged contract is this: One Stuart was president of the bank, and also treasurer of the American Cereal Company, of which Schumacher was president. For many years he had been a friend and associate of Schumacher. In May, 1896, the affairs of Schumacher, who had been on the verge of failure since 1893, reached a crisis. At the Great Northern Hotel in Chicago, Schumacher held a meeting with some friends and advisers.

Stuart attended. Schumacher's attorney, after the situation was reviewed, stated that whether an assignment for the benefit of creditors should be made at that time depended on the probable disposition of the various holders of Schumacher's collaterals to extend time, and asked Stuart what course his bank would take if an assignment were made. Stuart replied:

"You know that my relations with Mr. Schumacher and the relations of the bank have been very friendly for many years, and you can always rely on us to do all in our power to protect the interest of the estate. If an assignment is made, our bank will be the last to force a sale of the pledged stock."

Thereupon Schumacher assigned.

The bank was not bound. The directors never authorized its president to make such a contract, and never ratified his action, if it is assumed that he was undertaking to act as bank president, and not merely as Schumacher's friend. The facts warrant no implied authority for holding the bank to Stuart's promise. It never received any pecuniary or other consideration, without surrendering which it could not disclaim Stuart's action. And if Schumacher changed his position, through reliance on Stuart's unauthorized promise, he must look to him.

2. More than eight months having elapsed with nothing paid on interest or principal by the assignee, the directors placed Schumacher's notes and collaterals in the hands of the bank's attorney, with directions to realize thereon. On December 7, 1896, he notified the assignee that unless the claim were paid promptly he would proceed to sell the collateral. The assignee was unable to pay, and asked 60 days in which to endeavor to find means for taking up the claim. The extension was refused, and on December 11, 1896, the attorney notified the assignee of a $30,000 bid. The assignee acknowledged his inability to make or find a better one, and thereupon the sale was made.

There is nothing in the record to impugn the good faith of the bank and its attorney in making the sale. The directors and officers, other than Stuart, are not shown to have known of or participated in Stuart's campaign to bear American Cereal Company stock. The evidence of the alleged conspiracy among the appellees fails. It is only by long-drawn inferences and suspicions, rather than by satisfactory proof, that the purchaser Douglas is connected with Stuart's alleged design. But if it were otherwise, the bank and the other defendants not having participated in the alleged fraud, we think the plaintiff had an adequate remedy against the wrongdoers for damages in an action at law, wherein it would have been as easy as here to prove the true value of the stock at the time of the sale.

From a careful study of the record we discover no error in the decree, and it is accordingly affirmed.